This case today is case number 419-0496. In re K.B., we'll show the appellant present by counsel, Ms. O'Neill, and the appellee by Mr. Williams. You may proceed, counsel. Thank you, Your Honor. May it please the Court, I'm Court Judge Heidi C. O'Neill, and I'm a senior attorney with Pitt Court Quality, and I represent the appellant, Mr. Williams. The stand apparently putting their hopes on their misguided jurisdictional argument, which apparently is meant to deflect attention from the heart of this appeal, because they realize that they have no real legitimate argument here. But, because they have raised the jurisdictional argument, I believe I have to address that first, because it becomes the first hurdle that the appellant has to overcome to get to the real deal. The State claims that Supreme Court Rule 570-A-6 applies to all orders permitting external rights. In a case that misguided belief on the case of N. Ray K.B., which is not analogous to the facts of this case. In that case, the mother's rights were never terminated, and the father's rights were terminated on default. And so, all matters before the court have not been adjudicated, which meant that the default order terminating the father's rights in that case was actually in the law. However, the court went ahead and heard the case anyway, because it felt that justice demanded that, and because it was still within the time of post-trial motions, and the case was actually remanded. I have done child welfare cases for 29 years, and Supreme Court Rule 303 has always conferred jurisdiction, and I apologize once again for my typographical error in both my main brief and my reply brief, when I referred to Rule 303 as 301. The supplemental case that I submitted to the Court and Counsel, N. Ray Lewis, the 6th District case in 2017, makes it clear that in J.A. cases, an order terminating parental rights is a final order, not an interlocutory order, from which the party has 30 days in which to file a notice of appeal, where 303 confers jurisdiction. And since the final order in this case was not actually entered until June 17, 2019, the notice of appeal filed July 11, 2019, was timely. I will concede that this case had a lot of twists and turns in trying to get that final order, but it was not due to lack of diligence. It just kept not getting issued, and it was an unusual circumstance to have Judge Bradley Rao lose the election to the circuit judgeship that he had been appointed to, and while we were waiting to get a final order entered, he became no longer a judge. That was part of the problem. Then Judge Jeremy Ritchie took his place, and it wasn't until 2019 when the parties without the power appeared for a presidency review hearing, and the state and DCFS attorney told Judge Ritchie that they could not move forward with the adoption because the attorney for DCFS had determined that there was no final order. So how we finally got the final order in June. But the real issue here is the state's failure to meet their burden of proof that, by clarifying the evidence, Judge Fischer is an unfit parent, as defined by 750 ILC as D1P, which I will be referring to as paragraph P. In the present case, the state's determination for a parental rights petition alleged that Tisha was unable to discharge her parental responsibilities because of a mental illness and that there is sufficient evidence to believe that this inability would last beyond a reasonable period of time. The actual language of paragraph P demands, in addition, that this evidence must come from a psychiatrist, a licensed clinical social worker, or a clinical psychologist. Tisha concedes that she has a serious mental illness, bipolar disorder, and that that is a condition which is manageable with medication but not curable. The state called one expert witness, Dr. Lawrence Jekyll, a respected psychiatrist here at Central Illinois, who had examined Tisha on November 27th of 2015 in conjunction with the Douglas County felony case, in which that was how she landed in the Carmel Mental Health Center after being found MGRI in that case, not guilty by residency. But Dr. Jekyll did not provide the necessary evidence to meet the state's burden of proof, even though he was their witness. In fact, he testified to the contrary. He brought up the fact that he has an employee who has a bipolar disorder who, besides working for him and parenting successfully small children, had graduated from law school and recently passed a bar exam. At the time the state filed their termination petition, the respondent mother was unavailable to parent her child. But that's not what the state pled, and that is quite different than being unable to parent her child because of her mental illness. The state may have legitimately prevailed if they had filed under paragraph M, Fairer to Make Reasonable Progress. It is not unlikely that a parent is in prison, and they may be doing everything they can to the parenting test, the GED test, and so forth, to put themselves in a position to parent their child upon their release, but they are simply unavailable. But the state cannot terminate parental rights on grounds that they have not pled, and they have not pled ever in this case that the mother had failed to make reasonable progress toward the return of the child. So the state cannot prove that the mother was an unfit parent under the definition that they used, paragraph 3, so the case must fail. But assuming for the sake of argument that they did make their burden of proof by clear and convincing evidence, and that somehow Dr. Jekyll's testimony could possibly be construed to say what they needed it to say, they can't, as long as that's their decision. Well, before you do that, let me ask a quick question, and that is, you seem to be arguing that in addition to evidence of the elements being satisfied, there needs to be professional opinions that they're satisfied. Yes, paragraph P specifically states that, that the parent has to be unable to parent their child due to mental impairment, mental illness, intellectual disability, or developmental disability, and such evidence has to come from these three specific people, a psychiatrist, a licensed clinical social worker, or a clinical psychologist. The state calls one such person a psychiatrist, Dr. Jekyll, and we call a licensed clinical social worker Amy Langhoff, who worked as a social worker for the appellant while she was at McFarland Mental Health Center, and in her position, her opinion also did not support the state's evaluation. So, in fact, there were two witnesses in that category, one called by us and one called by them, neither of which satisfied the state's burden under the statute. So it's not enough that there be circumstantial direct evidence of the infirmities, there must be an opinion of one of these three types of professionals to sort of prove up the element. Correct, Your Honor, and I don't know the reason for it, but I believe because the courts have the highest support of our property, it's determined that parenting for one's child is a fundamental liberty. And so it seems to be the state's position that someone with bipolar disorder, unpredictable, they say, was brought out in testimony. You know, it's not curable, they say. Sure. But the state's argument seems to be anybody with this disorder would not be in a position to parent their child, and that's simply not the case. If the legislature had not put this requirement in, then anyone could say that a parent has one of these disabilities and therefore they would always lose their children. And frankly, many disabled people in the country do lose their children. But Illinois has put this requirement in there for a reason, to make sure only the most severe cases where the person just clearly is so ill that they cannot possibly parent their child, not now, not in the future. The one case we did cite, Ingray S.R., and there are many others, make that purpose as clear. This woman had been in an unfit to stand trial for 10 years. She was living in a nursing home. She thought her children were the babysitters. I mean, she had no – she didn't even know what reality was 10 years later. So that is simply not the case here. In fact, what Dr. Jekyll testified to was that when he saw the appellant on November 27th of 2015, which was three weeks after the – what would otherwise be a criminal offense, she was stable. Because that shot in Vega, as Dr. Jekyll said they gave her on the way out the door, had finally had a chance to kick in. And she was stable three weeks after the offense and has been stable, the testimony was, between that time throughout the whole pendency of this case, other than in October of 2016 when she briefly became manic because of a medication change by her psychiatrist in McFarland. Those symptoms quickly disappeared as soon as that medication was withdrawn. So she was stable the entire time. And she did not meet even the lower standard of civil and voluntary commitment at any time since November 27th of 2015. So the state could not have met their burden. They did not have an expert who would testify that the appellant was unstable and unable to discharge a criminal responsibility. She was simply unavailable during that period of time. Well, counsel, do you agree that Dr. Jekyll did find that your client had a particularly severe case of bipolar disorder? Yes, ma'am. And then, in looking at the evidence with respect to her time being institutionalized and her history of alcohol and narcotic abuse, are you taking a position that it would not be possible for the court to find that she was not fit? Yes, because of the very specific questions that Dr. Jekyll needed to answer, which was, does her mental illness, which in this case the state was very specific. They usually aren't. They don't say which of the four categories. But in this case, the termination petition actually did say mental illness. So because of her mental illness, she is unable to discharge criminal responsibilities, which is in the present tense, and will be so for an extended period of time beyond what is reasonable. In 2018, that was simply not the case. In fact, by the best interest hearing, the testimony was the next day they were going to be issuing the team report, which they had told her was going to recommend her release. Which, in fact, we found out at the post-trial motion in October of 2018 that that, in fact, did happen the very next day. They recommended that, and by August 3, 2018, she was released from the environment. So it wasn't an unreasonable period of time. It was at the point in time, which again, the statute is written in present tense. At that time, she was not going to be, even if you could say she was unavailable, she was not going to be unavailable from a foster. So unavailable and unable to discharge criminal duties due to a mental illness is simply not the same thing. And their expert, any which way they asked him, did not say that. He testified to the contrary. He said he could not say that someone with her illness, even a severe case, could not parent. And both Dr. Jekyll and Amy Langhoff, the only two experts who testified in this case, testified that with a young adult, she was 28 when she got to the car when Ms. Langhoff said, and our present mental health system, which Dr. Jekyll excoriated, said that, you know, in years past, that this young woman would have been kept a month or two to stabilize her, not two or three days. And he said this is all related to the insurance company and managed care, and that these days, it's a revolving door. And the fact that she did not, she had so many hospitalizations was as much of an indictment against the mental health system as anything else. And you could not glean, because I asked him, can you glean from that that the patient didn't want to get well? And he said, no, not at all. And the testimony was that Ms. B had always taken her medication, never had any arguments, no incidents at McFarland. And she had led AA meetings and NA meetings, and that they had no reason to believe that she would not continue her sobriety and her medication compliance once she was there. And in fact, she testified that she gained that length of time that McFarland did help her. And I feel like that instead of punishing her for being ill and taking advantage of that part of the system really did work. You know, that's the one thing in her life that worked. You know, that time that McFarland did give her, the period of time she needed the therapy, the medication, the NA and AA meetings, all of that she had finally had the ability to become stable and productive. At the time of the finding of unfitness, how long had the child been in care? In the termination of unfitness, because she wasn't found at the disposition of being unfit. But yes, the child had been... Well, there was a finding of unfitness and then a termination of the parental rights. Right, right, right. In 2018, the child had been in foster care for almost three years. In a care plan, I might add, that was initiated by my client, the appellant actually had already placed the child with her aunt. This is a case that never should have been filed in the first place. And so, a safety plan would have been more than adequate. And the DCFS would have testified at the termination proceedings that yes, she could have used that. She didn't. She just didn't. And I will add also, this case was continued for trial three or four times by either the state's own motion or by agreement because the parties, as the state representative in court, were trying to come up with a different solution. Trying to find a guardianship solution. A guardianship solution that the state's word would not be as draconian as terminating the parental rights. The aunt testified that it was in fact her, the foster mother, that had decided against the guardianship because she thought it might bring some financial burden on her and her family that she did not want to absorb. She did not clarify if that meant attorney's fees or that she would lose the foster care monthly stipend because this is not a special needs child. I don't know what she meant by that. But the state, to answer your question about how long the child was in foster care, the case, the TPR petition had been filed in July of 17 and did not come on for trial until something like the 31st of May of 2018 in large part because the state was in agreement that termination in this particular instance, where we have a closed family, where there was a care plan, was maybe not in the trial system. And we argued in the best, as far as best interest, that the state's own actions by not providing visitation, by not even making sure that photographs, this was an infant, were sent to the mother, helped set things up where she failed at the best interest factor because the child was even, by the first summer, calling the foster parents mom and dad, mommy and daddy, when there hadn't even been an adjudication for the case yet. So, despite the fact that those efforts could have prevented a bond from forming, the evidence of the best interest was really also in the best interest. The mother tried to make those visits special. You know, there were pictures and exhibits of them in witches' costumes, decorating the room, and her going out and buying a camera, having her dad buy her a camera and having staff go develop the pictures. It was because of her own will and love for her child that she maintained that relationship, despite every effort to make it not be so. I think my time is up. Thank you, counsel. You will have additional time on rebuttal. Mr. Williams? Thank you, Your Honor. Thank you for your support, counsel. My name is James R. Williams, and it is my privilege to represent the state before you this afternoon in court. So, the state's initial position in this case is that this court should dismiss the appeal for lack of jurisdiction. And in Ray Haley D., which, if I recall correctly, was found to never address the briefing, our Supreme Court explained that an order terminating parental rights is non-final and illogical. Rule 3 of 786 likewise provides that an order terminating parental rights is illogical. So when a trial court enters a termination order, a party can either appeal immediately, wait for that order to become final, such as when a judgment of the option is made, but what a party cannot do is proceed as respondent here, which is to draft a case out for roughly a year by filing numerous unauthorized post-judgment motions. Here, after the court terminated parental rights in July 2018, a respondent filed a motion to reconsider in August 2018, which was denied at hearing in October 2018, and then a motion for a fitness finding in October 2018, which is really just another motion to reconsider, followed by yet another motion for fitness finding in April 2019, which, again, was really just another motion to reconsider, followed by a motion to vacate the best interest finding, followed by a memorandum of law, followed by a motion to retitle the motion to vacate best interest finding as a motion of a year for the first, which was filed in May 2019. So, in response to this series of filings, the state files a motion to strike, arguing that the trial court muster, especially because parental rights were terminated nine months earlier than July 2018. The trial court then did something that seems somewhat unusual, in that the trial court granted the state's motion to strike, but then also, seemingly in an attempt to confer appellate rights, said that the denial of the original motion to reconsider was final as of that day, but also said that no written order was required. Well, keep in mind, the lack of a written order was allegedly what prevented this from being final at the time, and yet the court rules no written order was required, but somehow this order's become final now, approaching a year later. But ultimately, whether the motion to reconsider was denied in October 2018 as it was orally just counsel failed to submit the written order she offered to do, or whether that order became final, so to speak, in June 2019 is really irrelevant, because in any event, the respondent did appeal from the July 2018 termination order, and none of those folks' motions told the time to appeal. So this July 2019 notice of appeal is timely by nearly a year. So ultimately, the jurisdiction issue here turns on whether an order terminating parental rights is an analogic order. If it's not, if it's a final order, then totally it would seemingly work, and perhaps the trial court was able to save this appeal, so to speak, by purporting to finalize the dismissal motion to reconsider in June 2019, even though that order was originally entered in October 2018. If, however, an order terminating parental rights is an allocatory order, it totally wouldn't work, and the respondent had to either appeal within 30 days, which she could have done, but didn't, or appeal following the finalization of the order, such as when an adoption order is entered. But our Supreme Court has seemingly clearly answered this question, based on my review, and Haley E. worked it. Without qualification as to the specific facts of that case, provides a general statement of law, which I believe cited here in the case. I apologize, but in any event, they provide a general proposition of law that orders terminating parental rights are non-final and it's an allocatory. So again, respondent could have appealed within 30 days, but she didn't do so. ...followed by, frankly, a series of substantive violations. So again, the state's initial position is that this court is just simply without jurisdiction because the appeal took time, like almost a year. Respondent did not address the conflict of interest issue, unless it's for any questions on that, I'm just remorseful to ask. So, as we all know, these are very tough cases. In this case, respondent was... there was testimony that she was diagnosed with a particularly severe case of bipolar type 1 disorder, the psychotic features, as well as polysubstance abuse disorder, well-made alcohol, cocaine, and cannabis use. The doctor testified that this bipolar disorder was a particularly severe case, was very unpredictable, and at the time of the hearing, it remained uncontrolled. The doctor also testified that the best predictor of future issues is the person's history. And here we have a history of various episodes of severe delusions, paranoia, and mania for which the respondent had been hospitalized roughly 25 to 30 times previously. And at the time of the fitness hearing, I believe I'm limited to that time frame. At the time of the fitness hearing, the respondent had actually been committed to McFarland as she had been for roughly two years. Now, Justice Kavanaugh, you made a point about which... I kind of picked that up in the briefing, but I don't think that I briefed it. The question about whether the expert has to basically offer an opinion as to the ultimate fact, I don't believe I briefed that issue, but it did seem like that was where the argument was going to end up for me. And to that end, in looking into that briefly, I saw nothing suggesting that they have to say, you know, the ultimate fact, so to speak, right? But it says that they provide evidence from which the court can determine whether or not the ultimate fact is satisfied. And here, like I said, based on, without reaction to all of the specifics, but based on preliminary testimony from Dr. Jekyll, I believe that this court had more than sufficient evidence for it to be able to make that a fitness determination. And I don't think that, and I may be mistaken, but I believe that subsequent progress or things that may have happened after that can't be really used to undermine the trial court's decision at that point in time. Did the trial court consider the fact that the respondent was in the care of McFarland in a controlled environment and whether or not there had been issues when she was not in a controlled environment? Unfortunately, Your Honor, I don't specifically recall. Did she have a history of noncompliance when outside of a controlled environment? Yes, she did, Your Honor. Now, just, first of all, with the medication regimen and treatment plan, but also with things such as substance abuse, which as the doctor did testify, using things like cocaine and alcohol would only worsen the already severe condition. So, yes, that was before the trial. Unless this court has any further questions on the fitness, I would just briefly move on then to the... I guess it was seemingly a due process argument. It was a little bit unclear to me precisely the framing of this issue. I apologize. That was probably my fault. But it seemed like, relying on this NREA-OS case, which really is altogether entirely distinguishable from the past ones in this court, the respondent first complained essentially of two things. The frequency of visitation, the fact that KB, once she was able to start speaking, started calling the foster parents of the person that was modeling that. With respect to the visitation, it's true that those did not start until late 2016, and that the large part of these ones were caught in a woman's jail, in a kind of jail, until February of 2016. She had to be charged with delivery to make the whole issue clear. And visitation was then reinstated immediately after the court was reviewed. So there wasn't really a short time there where visitations were altogether halted. But they were reinstated. And then, with respect to KB choosing to refer to the foster parents as modeling that, while the state certainly can understand why this would be very upsetting, it's our position that it just doesn't arise to be a process violation. In fact, a respondent herself admitted below that it was likely in KB's best interest to have that something along the attachment that comes with referring to somebody who modeled that. The main case that respondent cites on point in RAIN-OS is, again, it's entirely distinguishable. Very importantly, it's not a due process violation, because the trial court did what the appellate court found was effectively predetermine the outcome of the case by concealing the mother-child identity by the court. Actually, the court in all parties involved not to allow the child to know that this is his mother. That's not at all what we have here. The court in no way prevented KB from knowing that respondent was her mother. In fact, there's testimony that actually steps were taken to ensure that KB did know that respondent was her mother. In fact, KB did report that she was responding as her mother. So the whole notion that the outcome here was in any way predetermined by the orders of the court, it's just the RAIN-OS case is just something that we have to look over here. Justice Brewer, any further questions? I don't see any at this time. Thank you very much for your time, Your Honor. Thank you. Any rebuttal, Ms. O'Neill? Yes, Your Honor. I would submit that the state has not understood the motions for fitness that were filed in addition to the motions for re-hearing and motions for reconsideration. The state referred to that as just another motion to reconsider. I understand that what that was was an attempt to find her dispositionally fit, leaving aside what the judge had said about her parental rights, because once a parent is found unfit, there's no way for them to, once the case is completely over, there's no way for them to come back in to this case and reopen it. Very few, very narrow, two or three things that can reopen a case, and that's not helpful. So they're unfit forever. They can't hold their grandkids, babysit their grandkids, all kinds of stuff. So that was the reason for that motion. He says that we failed to submit a written word. That is simply not the case. The March 19, 2019 hearing, the permanent review hearing, for which the mother and I were not given notice, in that transcript, the state acknowledges that I gave her an order. I gave her an order. The judge refused to sign it, is that right? They refused to submit it to the judge because they didn't like the language, which I had repeatedly invited them to send me one, show me what you've got. I couldn't get an answer from them. So on March 19, 2019, when we weren't there, and DCFS says we don't have a final order, judge, the judge appeared to agree with that, but there was an acknowledgment that an order was submitted to the state. The state chose not to prepare their own or to give it to the judge. And the state made, just now, a comment that at the time of the hearing, the mother's mental health symptoms remained uncontrolled. There is absolutely no evidence that the mother's mental health symptoms remained uncontrolled. The evidence was that she was stable since November 27 of 2015. The fact that she was still a patient at McFarland Mental Health System had to do with a number of factors. One, the law is very different. There are a lot of things that go into releasing someone on traditional discharge. And she changed treatment teams. That was all explained in the testimony that once she changed treatment teams in November of that, it was basically policy. You have to be with the new treatment team for six months. Yeah, at least six months before they would recommend it. And so the time started over, but you could not make that inference that her mental health symptoms were not controlled. And all I wanted to say is visitation was not immediately started after she got to McFarland. That is not true. It was only after an ACR and a letter written to DCFS by the social workers at McFarland that the mother finally got visitation. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess.